In the Matter of PATRICK J. McMAHON, an Attorney, Respondent. ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK, Petitioner.

First Department, December 8, 1944.

S. C. Lewis of counsel (Einar Chrystie, attorney), for petitioner.

Arthur N. Sager of counsel (Joseph A. Byrne, attorney), for respondent.

*Per Curiam.* The petition, as originally served, alleged eleven separate charges of professional misconduct based upon the fact that between 1928 and 1939, the respondent " engaged in the practice of obtaining or assisting others to obtain money or value by issuing checks on bank accounts which the respondent either no longer maintained or in which he knew or had reason to believe he had insufficient funds, or by issuing checks upon which he subsequently stopped payment, by means of which money or value was obtained from innocent third parties."

During the hearings before the Official Referee, the parties, by stipulation, added a twelfth charge. It alleged, in substance, that the respondent and his associates obtained sums aggregating $3,000 from a Dr. Mark White by misrepresentations, both oral and embodied in a written instrument, as to services to be rendered; that no services were rendered of any substantial value; that no part of the money was returned to Dr. White and that respondent and his associates converted the entire amount to their own use.

The Official Referee has reported that all the charges have been sustained.

Before considering the twelve charges now before the court, it may be well to point out that in September, 1937, two complaints were made to the Bar Association of the City of New York, because of the respondent's practice of issuing checks which he had reason to believe would not be paid. At the conclusion of a hearing, at which it developed that the complainants had been paid the amounts due them, the chairman of the Grievance Committee of the Bar Association said to the respondent: " * * * if my colleagues are with me, we will file these charges, but if this happens again and if I am on this committee, I would recommend the charges be prosecuted. You cannot do business that way in this community and practice law in my humble judgment. You will do what you are advised to do, of course, but I think you made a serious mistake here, and I am glad it is rectified, and I hope it will not happen again."

In answer thereto, the respondent stated: " It will not happen again." The charges were then filed.

Despite that warning, and within a month thereafter, the respondent resumed his practice of issuing checks which he had reason to believe would not be paid. The proof submitted in support of the charges now under consideration established that such a check was issued. in June, 1938, another in July, 1938, two more that Fall and one each in January and April, 1939. There is evidence in the record, which does not cover

all the respondent's bank accounts, that during the period covered by the petition, at least *ninety-two* checks issued by him were returned unpaid by his banks. During the three months' period beginning September 26, 1938, *twenty-five* checks were returned unpaid by the Bank of Athens and in the two months' period beginning March 6, 1939, *twenty-six* were returned unpaid by the Modern Industrial Bank. Thus at least *fifty-one* such checks were issued by the respondent on his accounts in two banks after he had received the aforesaid warning from the chairman of the Grievance Committee of the Bar Association. The only other bank record of the respondent that was introduced in evidence covered his account in the Bank of Yorktown. That record revealed that in less than one month beginning August 9, 1934, *forty-one* checks issued by the respondent were returned unpaid by the bank.

The transactions which resulted in the first eleven charges against the respondent all follow the same course. In each instance he issued a check to a friend who gave it to an innocent third party to cash. According to the respondent, he issued the checks only on the promise of his friends that they would deposit sufficient funds in his bank to meet the payment of the check when presented. The checks when presented at respondent's bank were not paid but were returned for one of the following reasons: The account was " closed ", " short ", " attached ", " payment stopped " or there were " insufficient funds " in the account. Thereafter, the persons who had cashed the checks made numerous unsuccessful efforts to communicate with the respondent at his office or his home. Letters mailed to him were not answered. Telephone calls and personal visits resulted in statements that the respondent was not in at that particular time. In all but two cases, the respondent or someone acting in his behalf eventually paid the checks in full. This, however, was done in each case only after complaint had been made to the Bar Association, and, in some instances, after hearings had been conducted thereon by the Grievance Committee of the Bar Association.

The most charitable construction of which the evidence is susceptible is that the respondent permitted himself to be influenced by his friends to issue checks, generally for their personal benefit rather than for his, notwithstanding that those friends, on previous occasions, had paid nothing in redemption of checks issued by respondent despite their promises to do so.

With respect to the charge of obtaining moneys from Dr. White by misrepresentation, it appears that one Dr. Mark

White came to New York seeking financing for a sanitarium and pasture land for the raising of goats from which, he claimed, he could make a rejuvenating serum. Dr. White was introduced to the respondent and to an attorney named Heffernan by a man named Edward Crump. A conference resulted in a written agreement dated June 17, 1938, whereby Mr. Heffernan and the respondent, as attorneys, in consideration of the sum of $1,000 then paid and an additional fee payable on the performance of their undertaking, agreed to obtain for Dr. White a license to practice medicine in the State of New Jersey, a permit from the United States authorities to ship in interstate commerce the serum to be manufactured, a proper site for the establishment of a sanitarium and a piece of land suitable for the breeding and raising of goats. The respondent and Heffernan further undertook to obtain for a corporation to be organized for the aforesaid purpose, a loan or other financing in the sum of at least $500,000. Of the $1,000 paid by Dr. White, the respondent received $200 and Mr. Heffernan $200; the balance of $600 apparently went to Mr. Crump as the originator of the business.

On June 24, 1938, a telegram, signed by the respondent and Heffernan, was sent to Dr. White through Mr. Crump, reading as follows: " Corporation organization awaiting two thousand dollars Doctor White promised covering official fees and expenses and two hundred fifty you owe here. To save time remittance should be New York draft and not cashier's check. Estates suitable for sanitarium and others for laboratory and pasture already located."

In response to this telegram Dr. White sent the $2,000 requested. Of said amount, $716 was transferred to Mr. Crump in Chicago, and the balance divided between the respondent and Mr. Heffernan.

The respondent urges that in sending that telegram he relied upon the representations of Heffernan that he had located sites which he thought would be acceptable to Dr. White and that he had prepared the corporate papers and could obtain a loan. (Heffernan subsequently was disbarred by this court on the charge of having converted to his own use $3,400 entrusted to him by a client for investment — *Matter of Heffernan*, 260 App. Div. 577.)

The natural and reasonable implication of this telegram is that the required land had at least been located and that the organization of the corporation and fulfillment of the contract awaited only the payment of expenses in the amount requested.

The fact is that no " official fees and expenses " had been incurred in connection with the organization of the corporation by the respondent and Heffernan.

While it does appear that the respondent thereafter continued searching for a site that would be acceptable to Dr. White and that the latter on August 3, 1938, informed him that he would forward $1,000 necessary for the consummation of a deal for the sanitarium, this in no way detracts from the falsity of the representations that the $2,000 requested and received as aforesaid was needed for the expenses of incorporation, and the implied promise that upon its receipt the corporation would be organized.

Assuming, therefore, that the respondent, for causes beyond his control, was unable to obtain a license for Dr. White to practice medicine in New Jersey and that he was not to blame for the failure of the consummation of the project, the fact remains that he was a party to the sending of the aforesaid telegram whereby Dr. White was induced to give up $2,000 upon false representations.

The proof submitted by the petitioner established that the respondent was guilty of eleven charges of misconduct arising out of his issuance of worthless checks which he knew would be cashed by innocent third parties. The fact that the respondent issued these checks at the request of friends and that he subsequently paid most of them does not relieve him of the consequences of his wrongdoing. He engaged in this practice over a period of years and continued it despite earlier complaints to the Bar Association and his promise that he would discontinue such activities.

The petitioner has also established the guilt of the respondent on the twelfth charge. In the expectation of personal financial benefit, the respondent participated in a scheme to obtain $2,000 from Dr. White by making representations which were false in fact. No part of that sum has been repaid to Dr. White.

The respondent should be disbarred.

MARTIN, P. J., TOWNLEY, GLENNON, UNTERMYER and COHN, JJ., concur.

Respondent disbarred.